IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| Lantern Maritime Company, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Case No. 1:19-cv-01647-LPS |
| vs. | § | |
| | § | IN ADMIRALTY, Rule 9(h) |
| Chembulk Trading II, LLC, | § | |
| | § | |
| and | § | |
| | § | |
| Chembulk Ocean Transport, LLC | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| Archer-Daniels-Midland Company | § | |
| | § | |
| BP Chemicals Americas Inc. | § | |
| | § | |
| Covestro LLC | § | |
| | § | |
| E D & F Man Liquid Products LLC | § | |
| | § | |
| ICOF America Inc. | § | |
| | § | |
| Kolmar Americas, Inc. | § | |
| | § | |
| Mitsubishi Chemical America, Inc. | § | |
| | § | |
| Mitsubishi Chemical USA, Inc. | § | |
| | § | |
| Shell Chemical LP | § | |
| | § | |
| Total Petrochemicals & Refining USA, Inc. | § | |
| | § | |
| Twin Rivers Technologies US, Inc. | § | |
| | | |
| YARA North America, Inc. | | |
| | | |
| Garnishees. | | |

**FIRST AMENDED, VERIFIED COMPLAINT WITH
REQUEST FOR ISSUANCE OF PROCESS OF
<u>MARITIME ATTACHMENT AND GARNISHMENT</u>**

Lantern Maritime Company ("Lantern") brings this action against Chembulk Trading II, LLC ("Chembulk"), and Chembulk Ocean Transport, LLC ("Chembulk Ocean") *quasi in rem*, pursuant to Supplemental Rule B for Certain Admiralty and Maritime Claims, requesting the issue of writs of maritime attachment and garnishment including against Garnishees and states as follows:

## Jurisdiction and Venue

1. This is an action within this Court's admiralty jurisdiction pursuant to 28 U.S.C. § 1333 and is an admiralty or maritime claim within Fed. R. Civ. P. 9(h). Lantern further brings this action pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1, 8 because it involves a maritime transaction (charter party) and maritime tort injury concerning Chembulk, Lantern hereby demands security for arbitration proceedings proceeding in London (the "London Arbitration"), pursuant to the charter party terms.

2. Venue is proper in this District because the Garnishees are within the meaning of Supplemental Rule B located, can be found, and/or can be served with process in this District.

3. Venue is also proper in this District because Defendants' property is or soon will be in this District.

4. Defendants cannot be found in this District within the meaning of Supplemental Rule B.

## The Parties

5. Lantern is a corporation organized under the laws of the Republic of the Marshall Islands and owns the M/T CHEM RANGER, IMO No. 9490296, an ocean-going tanker vessel (herein, the "Vessel").

6.      Chembulk is a corporation organized under the laws of the Republic of the Marshall Islands, chartered the Vessel from Lantern. And by information and belief is the alter-ego of Chembulk Ocean.  Chembulk , as detailed herein, wrongfully has failed or refused to pay Lantern as the Charter and related documents requires.

7.      Chembulk Ocean is a corporation organized under the laws of the Republic of the Marshall Islands and by information and belief is the alter-ego of Chembulk.

8.      Garnishees each are entities with offices or agents located in this District which, on information and belief as detailed below, Lantern reasonably believes holds accounts which are the property of and/or owing to Chembulk and/or Chembulk Ocean.

**Facts**

9.      Lantern and Chembulk on July 6, 2012 entered into a Charter for the use of the Vessel and thereafter agreed to related documents, also requiring Chembulk to pay Lantern under the Charter (collectively, "Charter").   The Charter required that Chembulk pay charter hire and for demurrage and other expenses associated with Chembulk's Charter for the Vessel. Chembulk has breached the Charter in a series of ways.

10.     Chembulk and Chembulk Ocean by information and belief are alter-egos of one another.  Chembulk Ocean, for example, ordered and apparently paid for bunkers for the Vessel, even though Chembulk was charterer of the Vessel.  At the end of the Charter, Chembulk Ocean received, after its request to Lantern, an amount agreed for the value of the bunkers remaining on the Vessel, even though the Charter was in the name of Chembulk.

11.     Chembulk has been making earnings payments to the personal benefit of Mr. Brian Ladin since 2014 with the effect that a total amount of US $666,609.99 was paid to him, or companies of his interest, rather than to Lantern.  This is in violation, among other things, of the Charter dated July 6, 2012, the Notice of Assignment of Earnings dated July 20, 2015 in favor of

NIBC Bank N.V. (the "Bank") which was served on Chembulk and the Acknowledgement of Assignment signed by Chembulk on July 21, 2015, requiring: (i) all earnings to be paid into a specific mortgage account; and (ii) not to accept any alteration to these instructions unless provided by the Bank.  As a result of Chembulk's failure to make earnings payments as set out above, Lantern's losses are in the sum of at least US $666,609.99.

12.     Chembulk made a unilateral and wrongful deduction of US $39,192.18 to the payment of Charter Hire Statement No.150.  To date, Chembulk has failed promptly, or at all, to justify the deduction by providing supporting vouchers.

13.     Chembulk's unilateral statement dated June 24, 2019 that, moving forward, it intended to pay hire at a rate of US $6,500 per day rather than what the Charter required Chembulk to pay, constituted a repudiatory breach and/or a renunciation of the Charter, evincing an intention by them to no longer be bound by the terms of the Charter.  Lantern accepted Chembulk's renunciatory and/or repudiatory breaches of the Charter and terminated the Charter on August 7, 2019.  As a result of Chembulk's breaches, Lantern is entitled to damages for its loss of profit for the balance of the Charter.  This amounts to losses in the sum of US $568,787.00, being the difference between Lantern's minimum income under the Charter (US $16,575.00 per day), less the prospective market rate for the Vessel of US$10,943.45 per day, the Vessel's time charter equivalent ("TCE," a calculation of the Vessel's average daily revenue performance) for the year to date, as per the Charterers' figures), multiplied by the balance of the Charter (101 days from the date of termination to the earliest date for redelivery).

14.     The invoiced daily hire figures in Lantern's Hire Statements since February 28, 2019 were entirely without prejudice to Lantern's primary position that US $17,000 was the correct daily hire rate throughout the duration of the Charter.  Lantern therefore claims the difference in earnings between the correct daily hire rate of US $17,000 and the invoiced daily

hire figures.  This amounts to the sum of US$1,550,096.31, being the difference between the average invoiced amount from February 28, 2019 until August 7, 2019 and the correct daily hire rate, less commission.

15.     Further, in December 2018, Chembulk gave unlawful orders to proceed to Samsun, Turkey to load an injurious cargo of phosphoric acid that was off-specification.  As a result of Chembulk's unlawful conduct, the Vessel spent some 40 days unable to improve the Vessel's base rate when her peer group vessels were performing in excess of US $16,500 per day.  In addition to this dilution in earnings, Lantern incurred considerable legal and surveyor costs in order to protect its position, and incurred extra port costs at Samsun.  Lantern's losses amount to at least the sum of US $77,081.60.

16.     Further, in breach of the Charter, Chembulk Ocean, and through it, Chembulk supplied bunkers to the vessel including at Deer Park, USA on March 27, 2018 that were outside of the warranted specification in the Charter.   Chembulk Ocean, in suit filed against the bunker provider World Fuel Services in the United States District Court, Southern District of Florida, Case 1:18-cv-24912-JEM, has admitted that the bunkers "did not meet the required qualifications and specifications and caused damage to the Vessel."   As a result of the Chembulk's and Chembulk Ocean's breach, the Vessel suffered engine damage and was forced to deviate to a port of refuge, with tug assistance, for repairs.  The out-of-pocket expenses in respect of (i) tug expenses; (ii) repair costs; (iii) port charges; (iv) travel/attendance; and (v) crew wages, amount to US $604,908.45.  Further, Lantern claims losses in respect of foregone profit share under the Charterparty as a result of the delays. As a consequence of the bad bunkers, delays, deviation, and additional voyage expenses were attributed to the Vessel's Voyage 33 which in turn lowered the TCE finally achieved.  But for the delay and deviation, Lantern has been entitled to profit share in the amount of US $36,167.03.

17.     As a result of the incident, there was a miscalculation of the Charter subsequent base rate as a result of understated earnings and/or overstated expenses for that voyage.  By way of explanation, the base rate for the period subsequent to the incident was calculated on the total net revenue generated during the preceding period.  The expenses were overstated, given the extra consumption of bunkers.  Meanwhile, the revenue is understated as a result of lost days arising as a result of the incident.  These losses amount in total to lost profits of US $254,342.53. The total value of Lantern's losses amounts to US $604,908.45.

18.     Chembulk Ocean's placement of the bunkers aboard the Vessel, in particular, led to damage of the Vessel's engines and other direct losses totaling at least US $1,295,118.00, consisting of:

a)      US $604,608.45 in respect of (i) tug expenses; (ii) repair costs; (iii) port charges; (iv) travel/attendance; and (v) crew wages

b)      US $36,167.03 in respect of forgone profit share

c)      US $254,342.53 in respect of a miscalculated base rate for the ensuing period (without prejudice to our position that the base rate ought to have been US $17,000/day); and

d)      US $400,000 in respect of costs

19.     Lantern also has suffered further losses for which they are entitled to damages in London Arbitration as a result of Chembulk's unreasonable delay in releasing the Vessel in Case 3:19-cv-00513-BAJ-RLB before the in the United States District Court for the Middle District of Louisiana, as follows:

a)      Chembulk had the United States Marshal arrest the Vessel at 4:00 p.m. on August 9, 2019;

b)      Two days before, however, on August 7, 2019, Chembulk's London lawyers served a security demand in which they demanded security "into escrow or IG Club LOU (subject to agreement on wording)."

c)      Following the arrest, at 11:35 a.m. London time, August 12, 2019, Lantern's London lawyers confirmed Lantern's offer of a LOU (letter of undertaking) to be provided by North of England P&I Designated Activity Company ("North DAC"), a full member of the IG Group and a party to the group's pooling and reinsurance arrangements.  However, Chembulk refused to accept an LOU from this entity, instead demanding an LOU must be provided only by "NEPIA Ltd registered in England and Wales," who were not the vessel's insuring entity.

d)      Efforts to agree the North DAC failed during August 13, 2019, notwithstanding the fact that Chembulk was provided with a letter confirming North DAC's membership of the IG Group and the S&P Global Ratings for North DAC. Chembulk had no complaints as to the substantive wording of the LOU.

e)      As a result of Chembulk's position, the parties agreed to the terms of an escrow agreement, executed at 1:30 p.m. London time August 14, 2018.

f)      Chembulk's refusal to accept the North DAC LOU was entirely unreasonable and caused a delay in releasing the Vessel of some 2.081 days above and beyond the ordinary time it would have taken to release the vessel.  This resulted in (i) a loss of earnings for this period; (ii) bunkers consumed for this period; (iii) extra port charges for this period; and (iv) cancellation fees as a result of the vessel missing its arranged slot to pass the Panama Canal.   These losses amount to the sum of US $87,938.59.

20.      Chembulk's arrest of the Vessel included an arrest for bunkers remaining on board the vessel at the time the Charterparty was terminated on August 7, 2019, in the sum of US $229,690.48.  The particulars are as follows:

a)  Chembulk alleged in its Verified Complaint dated August 8, 2019 that "[d]espite express notices of the amounts due and owing under the Charter  Party .  .  .  . LANTERN has failed, neglected, and/or refused to remit payment".

b)  This statement in Chembulk's Complaint is plainly incorrect and misleading:

i)  In their Notice of Termination dated August 7, 2019, Lantern made an express offer to pay Chembulk for the bunkers remaining onboard:  "the Charterers are invited to provide the Owners with receipted invoices for the current bunkers [remaining on board ("ROB")] against which the Owners are willing to reimburse the Charterers for the costs of the same once the figures are agreed and once the Charterers have procured the bunker supplier's confirmation that all supplied bunkers have been settled and paid for."

ii)  This was in accordance with Clause 50(a) of the Charter which sets out clearly that:  "Charterers and respectively Owners, shall take over and pay for all bunkers remaining on board upon delivery respectively redelivery, at the net prices actually paid by Owners respectively Charterers (including barging if any); and each party shall provide the other with receipted invoices from their bunker suppliers, in proof thereof. Charterers shall procure Bunker Supplier confirmation that all supplied bunkers have been settled and paid for prior to the vessel's redelivery."

c)  Lantern's offer to make payment of the bunkers remaining onboard remained open throughout.  However, Chembulk, through their London lawyers, only provided receipted invoices and bunker supplier confirmation in an email 8:52 a.m. London Time on August 13, 2019, some four days following the arrest of the Vessel.

d)      In the circumstances, Chembulk's arrest of the Vessel for bunkers that were said

to be "due" was wrongful and intentionally failed to acknowledge Lantern's offer

to pay for the bunkers remaining onboard prior to the arrest."

As a result of Chembulk's unreasonable rejection of the LOU, Lantern suffered losses including (i) lost earnings; (ii) extra port charges; and (iii) cancellation charges for the Panama Canal caused by a missed slot.

19.      Paragraph 11 of Chembulk's Complaint in Case 3:19-cv-00513-BAJ-RLB also is misleading.  Chembulk has not made all earnings payments to Owners as required.  A Notice of Assignment of Earnings dated July 20, 2015 (the "Assignment") was served on Chembulk in favor of NIBC Bank N.V. (the "Bank") requiring sums due to Lantern to be paid to the Vessel's earnings account held at the mortgagee bank (the "Earnings Account").  Chembulk formally acknowledged the assignment by way of an Acknowledgement to Assignment of Earnings dated July 21, 2015 (the "Acknowledgement").   Notwithstanding this, Chembulk then made substantial payments in direct violation of its obligation to pay those sums to the Earnings Account pursuant to the Assignment and the Acknowledgement.  Chembulk gave no reason why it continued to make payments to an intermediary in breach of the Assignment.

20.      Lantern understands that payments of at least US $447,617.88 have been made in this regard and payment totaling US $666,609.99 may have been wrongly directed by Chembulk.

21.      Paragraph 12 of Chembulk's Complaint in Case 3:19-cv-00513-BAJ-RLB also wrongly claims that Chembulk overpaid hire under the Charter.   Chembulk instead undertook to re-examine approximately 5 years and concluded that hire it calculated and paid was in fact wrong. Chembulk has failed and refused to provide any underlying documents or vouchers to support their position other than a mathematical calculation.   In the circumstances, Chembulk's calculations cannot be justified or verified.  Moreover, in circumstances where Lantern believes

Chembulk has wrongly remitted earnings in the sum or approximately US $666,609.99, Lantern rejects that there is a net overpayment of hire/earnings in the sums asserted by Chembulk.

22.       Paragraph 10 of Chembulk's Complaint in Case 3:19-cv-00513-BAJ-RLB also is inaccurate and misleading.   On or about 21 December 2018, Chembulk provided Lantern with a specification for an intended Phosphoric Acid cargo to be loaded at Samsun, Turkey. After careful consideration of the cargo, Lantern reverted to Chembulk on 31 December 2018 to advise that a cargo of that composition would be too aggressive and would be injurious to the vessel's cargo tanks.  In particular, the fluorides in the cargo specification exceeded the vessel's cargo tank manufacturer's safe thresholds. Lantern provided Chembulk with a copy of the relevant extract from the corrosion resistance analysis published by the manufacturer of the vessel's tanks. Fluoride is one of the critical corrosive aggressors in Phosphoric Acid. It is the element (along with Chloride) that typically causes tank damage in Phosphoric Acid incidents and its potency is non-linear and exponential in increasing concentrations.  The loading temperature of the cargo is another key factor. Lantern strongly encouraged Chembulk to seek their own expert opinion on the cargo as it appeared Chembulk had little understanding of the effects of Phosphoric Acid on vessel cargo tanks.  It was also Lantern's understanding that other vessel operators has already rejected carrying the intended cargo from the Samsun plant owing to concerns about its characteristics.

23.       Lantern repeatedly made requests to Chembulk for detailed information about the characteristics of the intended cargo but nothing substantive was forthcoming. The very limited information that was provided by Chembulk offered no comfort and merely fueled Lantern's concerns that the cargo would be injurious to the vessel and outside of the Charterparty carriage parameters.   In the meantime, the Vessel proceeded to Samsun, Turkey in accordance with Chembulk's orders and tendered a Notice of Readiness.

24.     Chembulk, however, made it plain that they had no intention of demonstrating that the cargo to be provided for loading would, in fact, be safe for loading and that it was for Lantern to investigate the safety of the cargo.  This showed a reckless disregard for the terms of the Charterparty and the safety of the vessel's cargo tanks.

25.      In direct response, Lantern, at its own expense, deployed two experts from the internationally recognised surveying company, Brookes Bell (an expert metallurgist and an expert chemist) to Samsun, Turkey to investigate the cargo. The two Brookes Bell experts were repeatedly refused access to the cargo and the plant processes despite staying in Samsun for about two weeks for the express purpose of determining whether the cargo was safe for carriage. The plant was categorically unable to give any reassurance that the cargo would be within the vessels' safe carrying limits.  Moreover, it was understood by Lantern that Chembulk had in fact entered into a sub-charterparty to carry a cargo with parameters that were outside of the vessel's safe carrying limits.

26.     On February 7, 2019, in a further effort to induce Lantern to load the cargo, Chembulk represented to Lantern that the loading temperature of the cargo would be 14 degrees Celsius – temperature also being a key parameter affecting carriage safety.  Brookes Bell's investigation locally discovered that this statement was wrong and the cargo temperature was estimated to be much higher. Chembulk's statement was not only wrong, it was made with a reckless disregard for the safety of the vessel.

27.     Ultimately, Chembulk informed Lantern that the sub-charterers had terminated the sub-charterparty.  Chembulk then ordered the vessel away from Samsun, Turkey in order to conduct a different carriage.

28.     Lantern therefore demands security in its arbitration for a total sum of **US $5,633,418.43** detailed as follows:

| | | |
|---|---|---|
| Wrongfully Remitted Hire | $ | 666,609.99 |
| Statement #150 Deduction | $ | 39,192.18 |
| Loss of Profit for Balance of Charter | $ | 568,787.00 |
| Incorrect Base Rate Adjustment to Date | $ | 1,550,096.31 |
| Orders to Load Phosphoric Acid at Samsun | $ | 77,081.60 |
| Bad Bunkers stemmed at Houston | $ | 895,418.01 |
| Delay in Arrest Release | $ | 69,549.65 |
| **Sub-Total** | **$** | **3,866,734.74** |
| Interest (5% for 5 years) | $ | 966,683.69 |
| Costs | $ | 800,000.00 |
| **Total** | **$** | **5,633,418.43** |

## Count I – Breach of Maritime Contract

29.     Lantern incorporates the above paragraphs as if fully set forth herein.

30.     Chembulk breached its maritime contract with Lantern as set out above.  Despite repeated demand, Lantern remains unpaid.

31.     Lantern therefore demands judgment, as set out more fully below.

## Count II – Maritime Tort

32.     Lantern incorporates the above paragraphs as if fully set forth herein.

33.     Chembulk Ocean caused bunkers which it now admits were noncompliant and injurious to the Vessel's engines, to be loaded aboard the Vessel.  Chembulk Ocean had a duty of care, after undertaking to have bunkers loaded aboard the Vessel, to assure that the bunkers loaded did not injure the Vessel.

33.     Chembulk Ocean has breached its duty of care and caused Lantern damages as demanded herein and below.  Lantern therefore demands judgment against Chembulk Ocean, as set out more fully below.

## Count III: Maritime Attachment and Garnishment (Rule B)

34.     Lantern incorporates the above paragraphs as if specifically set forth herein.

35.     Lantern seeks issue of process of maritime attachment so that it may obtain

payment for the amounts due to it under the Charter (from Chembulk) and in tort for damages to the Vessel (from Chembulk Ocean).

36.     No security for Lantern's claims has been posted by Chembulk, Chembulk Ocean, or anyone acting on its behalf to date.

37.     Chembulk and Chembulk Ocean cannot be found within this District within the meaning of Rule B, but is believed to have, or will have during the pendency of this action, property and/or assets in this jurisdiction consisting of cash, funds, freight, hire, and/or credits in the hands of garnishees in this District, including but not limited to those named Garnishees herein.

### **Prayer for Relief**

WHEREFORE, Lantern prays:

A.     That in response to Count I, process of maritime attachment be issued to garnish and attach property of Chembulk in the amount of at least **$5,633,418.43** as detailed above, in security of Lantern's claims asserted in the Charter arbitration commenced in London, upon that amount being garnished and attached, this action to be stayed and the amount to await final award in arbitration and judgment entered on such award by this Court;

B.     That in response to Count II, process of maritime attachment be issued to garnish and attach property of Chembulk Ocean in the amount of at least **US $1,345,118** (**US $1,295,118.00** as detailed above and a further **US $50,000** for interest and costs), in security of Lantern's claims in maritime tort against Chembulk Ocean;

C.     That in response to Count III, since Defendants cannot be found within this District pursuant to Supplemental Rule B, this Court issue an Order directing the Clerk to issue Process of Maritime Attachment and Garnishment pursuant to Rule B attaching all of Chembulk's and Chembulk Ocean's tangible or intangible property or any other funds held by

any garnishee, up to the amount of at least the amount demanded herein to secure Lantern's claims, and that all persons claiming any interest in the same be cited to appear and, pursuant to Supplemental Rule B, answer the matters alleged in the Verified Complaint;

D.      That as provided in Supplemental Rule B, that such person over 18 years of age be appointed as moved for herein pursuant to Supplemental Rule B and Fed. R. Civ. P. 4(c) to serve process of Maritime Attachment and Garnishment in this action;

E.      That this Court award Lantern such other and further relief that this Court deems just and proper.

Dated: September 24, 2019.

YOUNG CONAWAY STARGATT & TAYLOR LLP


*/s/ Timothy Jay Houseal*
Timothy Jay Houseal (Del. Bar ID No. 2880)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6682
thouseal@ycst.com

*Attorneys for Lantern Maritime Company*

**OF COUNSEL**

J. Stephen Simms
Simms Showers LLP
201 International Circle, Ste. 250
Baltimore, Maryland 21030
Telephone:      (410) 783-5795
Facsimile:       (410) 510-1789
jssimms@simmsshowers.com